UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| LYDIA SHAW, ) | CASE NO. 5:07CV2103 |
| ) | |
| Plaintiff, ) | JUDGE PETER C. ECONOMUS |
| ) | |
| v. ) | Magistrate Judge George J. Limbert |
| ) | |
| MICHAEL J. ASTRUE ) | **Report and Recommendation** |
| Commissioner of social security, ) | **of Magistrate Judge** |
| ) | |
| Defendant. ) | |

Lydia Shaw ("Plaintiff") seeks judicial review of the final decision of Michael J. Astrue ("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying her application for Disability Insurance Benefits ("DIB"). ECF Dkt. #1. Plaintiff asserts that the Administrate Law Judge ("ALJ") erred in: (1) failing to call a medical expert to testify regarding the significance of IQ test scores from 1964-65 with regard to Listing 12.02A7; (2) failing to consider evidence of disability that was generated after Plaintiff's date last insured; (3) failing to consider Plaintiff's complaints of disabling pain in accordance with an order from the Appeals Council; and (4) concluding that Plaintiff was not disabled without substantial evidence to support that finding. ECF Dkt. #13. For the following reasons, the undersigned RECOMMENDS that Court AFFIRM the ALJ's decision:

I.  **PROCEDURAL AND FACTUAL HISTORY**

On October 20, 1997, Plaintiff filed an application for DIB, alleging an onset date of July 2, 1995. Tr. at 74-76. Plaintiff alleged that she "was overmedicated for [her] thyroid - result head tremors." *Id*. at 97. Her application was denied initially and on reconsideration. *Id*. at 58-61, 63-65. Plaintiff did not file a request for a hearing. ECF Dkt. # 13 at 2.

On December 7, 2000, Plaintiff filed another application for DIB, again alleging an onset date of July 2, 1995. Tr. at 77-79. Her claim was denied on the basis of res judicata. *Id*. at 73. Plaintiff filed a memorandum explaining that she was seeking benefits for a medical impairment that

had not been diagnosed during the adjudication of her 1997 application. ECF Dkt. #13 at 2-3; Tr. at 67-69. An ALJ determined that the record contained new material evidence that was not contained in the record for Plaintiff's first DIB application; therefore, res judicata did not apply. Tr. at 433. The case was transferred to ALJ Rini ("the ALJ") for an administrative hearing. *Id*.

On March 19, 2002, the ALJ conducted an administrative hearing where she received testimony from Plaintiff and Ted Macy, a vocational expert. Tr. at 427-80. On September 27, 2002, the ALJ issued a Notice of Decision - Unfavorable. *Id*. at 294-303.

Plaintiff filed a request for review, and the Appeals Council vacated the ALJ's September 27, 2002 decision. Tr. at 304-06. The Appeals Council remanded the case to the ALJ for an evaluation of Plaintiff's complaints of pain in accordance with 20 C.F.R. 404.1529 and SSR 96-7p. *Id*. at 305-06. On January 13, 2004, the ALJ conducted another hearing where she received testimony from Plaintiff's daughter, Lisa Shaw. *Id*. at 481-529. On April 29, 2005, the ALJ issued another Notice of Decision - Unfavorable. *Id*. at 20-30. On May 15, 2007, the Appeals Counsel denied Plaintiff's request for review. *Id*. at 8-10.

On July 13, 2007, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. On November 28, 2007, Plaintiff filed a brief on the merits. ECF Dkt. #13. On January 28, 2008, Defendant filed a brief on the merits. ECF Dkt. #15. Plaintiff filed no reply.

**II.    SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

In her April 29, 2005 decision, the ALJ stated that the case had been remanded in order for her to "[e]valuate the claimant's subjective complaints in accordance with 20 C.F.R. 404.1529 and Social Security Ruling 96-7p." Tr. at 23. The ALJ noted that Plaintiff last met the special earnings requirements of the Social Security Act on June 30, 1998; therefore, she must establish that she was under a disability that began on or before that date. *Id*. at 24-25.

The ALJ stated that Plaintiff has a tenth grade education and past relevant work as a nurse's aide. Tr. at 25. Plaintiff testified that she stopped working full-time because she was frequently sick and needed to attend many medical appointments. *Id*. She claims that she experienced: heart palpitations; shakiness in her hands and her head; pain in her neck, shoulders, arms and hands; shortness of breath; and dizziness when looking up or down a "big" flight of stairs. *Id*.

Lisa Shaw testified that she returned home to live with her mother in 1991. Tr. at 25. She testified that she and her two children have lived with Plaintiff and Plaintiff's husband since 1991. *Id*. She testified that Plaintiff was working part time between 1991 and 1994 due to frequent illness and doctors' appointments. *Id*. The ALJ noted, however, that Plaintiff's earnings from 1991-1993 do not indicate that she worked significantly less time. *Id*. Lisa Shaw testified that Plaintiff stopped working after she was rushed to the hospital with concerns of a heart attack. *Id*. She testified that Plaintiff was in a lot of pain at the time, but doctors were unable to determine the cause of the pain. *Id*. She testified that Plaintiff's head started "shaking like crazy" and that Plaintiff had problems with head shaking for as long as Lisa could remember. *Id*. Lisa Shaw stated that doctors prescribed Paxil, but it caused Plaintiff's body to swell. *Id*. The ALJ noted, however that Plaintiff reported crying episodes in May 2000, but reported that she had no reason to cry. *Id*. On May 31, 2000, Plaintiff reported that the Paxil "had been very helpful" and that she was seeing a counselor who was also helpful. *Id*. Again, on August 22, 2000, Plaintiff reported that Paxil was working well. *Id*.

The ALJ then focused her attention on Plaintiff's medical records. Tr. at 25-28. On January 24, 1995, David Shewmon, M.D., examined Plaintiff on referral from Dr. Sybert for an evaluation of hyperthyroidism. *Id*. at 25. Dr. Shewmon observed an obvious head tremor and a twisting motion of her head. *Id*. Plaintiff also had a tremor in her outstretched hands. *Id*. Plaintiff's thyroid was two-and-a-half to three times its normal size. *Id*. Plaintiff had noticeable difficulty rising from the seated position without using her hands. *Id*. On June 15, 1995, Dr. Shewmon examined Plaintiff a second time and noted that she had hyperthyroidism, a head tremor, and a history of over-replacement with thyroid hormone and a history of right thyroid lobectomy. *Id*. Plaintiff complained that she did not have much energy. *Id*. On August 1, 1997, Plaintiff reported that she was feeling well and had no difficulty sleeping. *Id*. Dr. Shwemon noted no tremors in Plaintiff's hands and assessed her condition as stable. *Id*. at 26.

On March 2, 1995, Thomas Strachan, M.D. examined Plaintiff on referral from Dr. Sybert. Tr. at 26. Dr. Strachan indicated that Plaintiff had been experiencing an irregular head tremor for the past several months. *Id*. Plaintiff complained of intermittent swelling in her hands and feet, head tremors, fatigue, and a minor hand tremor, but she did not complain of pain. *Id*. Dr. Strachan

-3-

observed a minimal postural tremor in both hands and an intermittent irregular head tremor. *Id*. He noted that the tremor was unlike an essential tremor. *Id*. He advised Plaintiff that he would not conduct further testing until her hyperthyroidism had been resolved. *Id*. Dr. Strachan saw Plaintiff again in August, 2000 and observed obvious hypertrophy of the left sternocleidomastoid muscle with involuntary rotation of the head to the right. *Id*. He noted that Plaintiff's tremor was still present in her neck, but it had lessened in her hands. *Id*. He referred Plaintiff to Stanley Burns, M.D. and he suggested Botox injections. *Id*.

On January 7, 1998, Jose Ventosa, M.D. examined Plaintiff at the request of the Bureau of Disability Determination ("BDD"). Tr. at 26. Plaintiff complained of tremors in her head and neck stiffness. *Id*. She specifically denied tremors in her hands. *Id*. She acknowledged that she had tremors in her hands when she had hyperthyroidism, but the tremors have since subsided. *Id*. Dr. Ventosa noticed an "almost constant tremor in her head." *Id*. His clinical impressions included a history of hyperthyroidism, status post thyroid surgery, now on Synthroid, head tremor, and occasional pains in her neck, secondary to head tremors. *Id*. Dr. Ventosa opined that Plaintiff's abilities to hear, speak, sit, stand, walk, and handle objects were not impaired. *Id*.

On March 23, 1998, Gary Sipps, Ph.D. performed a psychological evaluation at the BDD's request. Tr. at 26. Plaintiff told Dr. Sipps that she was experiencing head tremors and that she was premenopausal. *Id*. She reported that she was receiving adequate amounts of sleep. *Id*. She also reported experiencing depression over the past 12 months because of her brother's death and the circumstances surrounding it. *Id*. She was experiencing frequent crying spells related to her menstrual cycle. *Id*. Plaintiff told Dr. Sipps that she felt relaxed when she read to her grandson or worked on puzzles with him. *Id*. She also stated that she dances with her grandchildren. *Id*. Dr. Sipps believed that Plaintiff's concentration and attention to tasks were adequate. *Id*. Plaintiff's daily activities include showering, making coffee, cooking breakfast for her grandchildren, sending them off to school, baking a cake, helping her grandchildren with homework, reading novels, and gardening. *Id*. at 26-27. She maintains contact with a friend, a cousin, and some other family members. *Id*. at 27. Following the clinical interview, Dr. Sipps administered an IQ test and measured Plaintiff's verbal, performance, and full-scale IQs at 75, 72, and 71, respectively. *Id*. He

measured her reading ability with the Nelson-Danny Reading Comprehension test at the 13.2 grade level equivalent. *Id*. at 27. Dr. Sipps' diagnostic impression included: cognitive disorder, NOS; adjustment disorder with mixed anxiety and depressed mood; and borderline intellectual functioning. *Id*. Dr. Sipps opined that Plaintiff had average abilities to concentrate, to attend to tasks, and to understand and follow directions. *Id*. He opined that her ability to withstand stress and pressure appeared to be below average. *Id*. Her ability to relate to others and deal with the general public appeared to be low average. *Id*. Dr. Sipps indicated that Plaintiff's overall functioning was at a mildly reduced level of activity. *Id*.

On June 5, 1998, William Fischer, Ph.D., Regional Office Medical Consultant, reviewed Dr. Sipps' report and indicated that Plaintiff would have the capacity to perform/sustain at least simple, routine, low stress activities that involved brief and infrequent contact with other people. Tr. at 27.

The ALJ then reviewed Plaintiff's school records. Tr. at 27. On June 3, 1964 Plaintiff was tested with the Otis Beta FM test and scored an 87 IQ. *Id*. On May 11, 1965, Plaintiff's IQ was measured at 93 with the Otis Beta OM test. *Id*. Although Plaintiff's counsel argued that the scores from 1964 and 1965 tests satisfy the "A" criteria for 12.02A(7) when taken in conjunction with Dr. Sipps' test, the ALJ stated that "[t]here is no foundation in the record that the tests administered to the claimant in 1964 and 1965 bear any resemblance to the tests administered by Dr. Sipps." Therefore, the ALJ found that the record does not establish a 15-point drop in measured intellectual ability, as Listing 12.02A(7) requires.[1] *Id*.

---

[1] Listing 12.02 provides in its pertinent part:

> 12.02 Organic Mental Disorders: Psychological or behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> A. Demonstration of a loss of specific cognitive abilities or affective

The ALJ reviewed medical records concerning claimant's condition subsequent to June 30, 1998, her date last insured. Tr. at 27. On May 2, 2000, Plaintiff was prescribed Paxil for her depression and crying spells. *Id*. On August 29, 2000, Plaintiff denied experiencing shortness of breath, chest pain, lightheadedness, headaches, or myalgias. *Id*. On November 29, 2000, she reported pain in her left elbow, left wrist, left index finger, and right pelvis after having fallen down some stairs. *Id*. On January 11, 2001, Plaintiff saw R. Stanley Buns, M.D. with chief complaints of pain. *Id*. The ALJ stated that all of these medical records were "too far removed from the claimant's date last insured to be relevant to her condition before that date. *Id*. at 28.

Next, the ALJ considered Plaintiff's testimony with respect to her limitations, restrictions, and pain. Tr.a t 28. The ALJ noted that her testimony was inconsistent with the lack of complaints of pain in the medical records. *Id*. Further, Dr. Sipps' report shows that Plaintiff's activities of daily living are inconsistent with her claim that she is disabled. *Id*.

The ALJ found that Plaintiff did not have significant hand tremors during the period at issue for any continuous period of twelve consecutive months. Tr. at 28. Although the records showed that Plaintiff experienced hand tremors in 1995, they decreased with treatment and eventually ceased prior to June 30, 1998. *Id*.

The ALJ found that Plaintiff has established that she suffers from a severe impairment, but her condition does not meet or equal a listed impairment. Tr. at 28. Based on Dr. Fischer's opinion, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to understand, remember, and carry out simple instructions with 1-2 step procedures of a repetitive nature. *Id*. The

---

> changes and the medically documented persistence of at least one of the following:
>
> \* \* \*
>
> 7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria-Nebraska, Halstead-Reitan, etc.;

ALJ found that Plaintiff's head tremors would have prevented her from climbing ropes, ladders, and scaffolds. *Id*. Further, due to the embarrassment Plaintiff experiences from her head tremors, she should be precluded from work requiring face-to-face interaction with the general public. *Id*. The ALJ found that the record does not establish any exertional limitations. *Id*.

The vocational expert testified that Plaintiff's past work as a nurse's aide would be classified as heavy exertional, semiskilled. Tr. at 28. The vocational expert opined that a person with Plaintiff's limitations could not perform Plaintiff's previous job as a nurse's aide. *Id*. The vocational expert opined, however, that such a person could perform jobs as a bench assembler, a wire worker, and an electronics worker. *Id*. at 29.

The ALJ also concluded that Plaintiff could have been expected to make vocational adjustments to be able to perform work that is available in significant numbers in the national economy. Tr. at 29. Therefore, the ALJ found that Plaintiff was not under a disability prior to her date last insured, June 30, 1998. *Id*.

**III. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (§§20 C.F.R. 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (§§20 C.F.R. 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see §§20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (§§20 C.F.R. 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (§§20 C.F.R. 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (§§20 C.F.R.

          404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *Id.*; *Walters,* 127 F.3d at 532. Substantiality is based upon the record taken as a whole. *Houston v. Sec'y of Health and Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

## V. ANALYSIS

### A. The ALJ's review of Plaintiff's IQ test results.

Plaintiff first contends that the ALJ erred in failing to call a psychological expert to testify as to the comparison between the Otis Beta IQ test scores Plaintiff received in 1964 and 1965 and the scores that Dr. Sipps measured during the consultative evaluation. ECF Dkt. #13 at 9. Plaintiff contends that the difference between her 1964 and 1965 test scores and Dr. Sipps' scores demonstrates that she satisfies the 15 IQ point loss that Listing 12.02A(7) requires. *Id*.

Defendant contends that it is Plaintiff's burden to establish a similarity between the tests, and she has failed to carry that burden. ECF Dkt. #15 at 8. Defendant also contends that, even if

-8-

Plaintiff could establish a 15-point drop in IQ, her disability claim would still fail because she has failed to satisfy the "B criteria" for Listing 12.02. *Id*. at 10-11.

    Listing 12.02 requires:

> A. Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:
>
>     \*    \*    \*
>
> 7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria-Nebraska, Halstead-Reitan, etc.;
>
> AND
>
> B. Resulting in at least two of the following:
>
>     1. Marked restriction of activities of daily living; or
>
>     2. Marked difficulties in maintaining social functioning; or
>
>     3. Marked difficulties in maintaining concentration, persistence, or pace; or
>
>     4. Repeated episodes of decompensation, each of extended duration;

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.02.

    The undersigned finds that the ALJ erred in failing to call an expert to testify as to the correlation between the Otis Beta IQ tests and the WAIS-III test that Dr. Sipps administered; however, that error was not prejudicial because Plaintiff has not satisfied the "B criteria" under Listing 12.02.

    In *Jones v. Apfel*, a district court considered whether an Otis Beta IQ test score could be used under Listing 12.05. Case No. CV-99-6227-ST, 2000 WL 1456907 (D.Or. Sept. 11, 2000), unreported; *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.00 (D)(6)(c) ("The IQ scores in 12.05 reflect values from tests of general intelligence that have a mean of 100 and a standard deviation of 15; e.g., the Wechsler series."). The *Jones* court noted that neither the claimant nor the ALJ obtained evidence as to what a score on an Otis Beta IQ test means and how that result compares to a score on the WAIS scale. *Id*. at \*12. Accordingly, the court held that "the SSA has not had the opportunity to compare Jones' Otis Beta IQ test score with the WAIS standard to

-9-

determine if they are equivalent, and this court cannot make that determination without first allowing the SSA to do so." *Id*. The *Jones* court ultimately concluded that the ALJ was not required to order the claimant to submit to a WAIS IQ test because the claimant was 53 at the time, and Listing 12.05 requires a subaverage IQ measurement before the age of 22. *Id*. at 13. The court then remanded the case for *the ALJ* to collect evidence as to what an Otis Beta IQ test score means and how a score on that test compares to a score on the WAIS. *Id*. (emphasis added).

The *Jones* case demonstrates that an ALJ can consider Otis Beta IQ tests and compare them to WAIS IQ tests. More importantly, an ALJ's failure to develop the record in this respect can constitute reversible error. Therefore, the undersigned recommends that the Court find that the ALJ erred in failing to collect evidence as to what an Otis Beta IQ test score means and how a score on that test compares to a score on the WAIS-III.

The undersigned does not recommend remanding the instant case, however, because the ALJ properly found that Plaintiff did not satisfy the "B criteria" for Listing 12.02. As the ALJ noted, Plaintiff reported daily activities to Dr. Sipps that are inconsistent with the testimony from Plaintiff and her daughter regarding Plaintiff's restrictions. Plaintiff told Dr. Sipps that her daily activities include showering, making coffee, cooking breakfast for her grandchildren, sending them off to school, baking a cake, helping her grandchildren with homework, reading novels, and gardening. Tr. at 192. Therefore, the ALJ's implicit finding that Plaintiff did not have marked restriction of activities of daily living is supported by substantial evidence (Listing 12.02B(1)).

Further, the ALJ's implicit finding that Plaintiff did not have marked restrictions in social functioning (Listing 12.02B(2)) is supported by substantial evidence because Dr. Sipps opined that Plaintiff's ability to relate to others and to deal with the general public was low average based upon the presence of assigned diagnoses, her presentation and demeanor during her consultative examination, and her statements regarding embarrassment from head tremors. Tr. at 194-95.

Likewise, the ALJ's conclusions regarding concentration, persistence and pace (Listing 12.02B(3)) are supported by substantial evidence because Dr. Sipps opined that Plaintiff's ability to concentrate and attend to tasks is average based upon WMS-III testing. Tr. at 194. Dr. Sipps also opined that Plaintiff's ability to understand and follow directions is average based upon her

responses during testing. *Id.*

Lastly, it appears that Plaintiff has not introduced evidence of repeated episodes of decompensation of extended duration, or at least, Plaintiff makes no effort to direct the Court to any such evidence. Regardless, the lack of any other functional limitations prevents Plaintiff from satisfying "B criteria" based solely on episodes of decompensation because 12.02B requires at least two functional impairments. Therefore, Plaintiff has failed to establish that she suffered from a disability under Listing 12.02B.

### B.     The ALJ's consideration of evidence post-dating the date last insured.

Plaintiff next contends that the ALJ erred in failing to consider evidence that was generated after Plaintiff's date last insured. ECF Dkt. #13 at 11. Plaintiff argues that her cervical dystonia was not diagnosed until January, 2001, but it is common for patients to suffer from the disorder and not be diagnosed for a significant period of time. *Id.* Plaintiff states:

> The ALJ essentially accepted Dr. Burns' diagnosis as a retrospective diagnosis for the time before the DLI, but then rejected all of the evidence after the DLI as it related to the issue of wether Ms. Shaw was disabled. The agency cannot have it both ways. If the agency is accepting Dr. Burn's evaluation and diagnosis generated after the DLI as a retrospective diagnosis, then all of the evidence generated after the DLI has to be considered, including testimony from lay witnesses such as Ms. Shaw and her daughter (Tr. 489-524) who testified at the second hearing in this claim.

*Id.* at 12.

The undersigned fails to see the basis for Plaintiff's argument because the ALJ did consider Plaintiff's complaints and Lisa Shaw's observations, albeit briefly. The important aspect of the ALJ's decision is that she considered Plaintiff's daily activities during the insured period. Tr. at 28. Although the ALJ did not thoroughly review the testimony from Plaintiff and Lisa Shaw in her decision, the ALJ's stated that "[t]he report from Dr. Sipps regarding the claimant's activities at that time (approximately three months before her date last insured) is clearly inconsistent and/or contradictory to the testimony of claimant and her daughter." *Id.* The Court can draw a reasonable inference from that statement that the ALJ considered Plaintiff's complaints and Lisa Shaw's testimony.

Plaintiff relies on treatment records from 2001 to establish that Plaintiff was in pain prior to the date last insured. ECF Dkt. #13 at 13. That argument, however, is misplaced because the ALJ

-11-

pointed to medical records from the insured period where Plaintiff reported no pain or little pain. For example, the ALJ cited Dr. Shewmon's records from June 15, 1995 where Plaintiff reported feeling "reasonably good." Tr. at 26 citing Tr. at 163. Again on August 1, 1997, Plaintiff reported that she was "feeling good." Tr. at 26 citing Tr. at 158. The ALJ pointed to Dr. Strachan's records where Plaintiff's reported complaints did not list pain. Tr. at 26 citing Tr. at 168. The ALJ also cited Dr. Ventosa's January 7, 1998 report where his clinical impression included **occasional** pains in her neck. *Id.* at 26 citing Tr. at 175.

In light of the foregoing evidence existing at the time of the insured period, the undersigned fails to see why evidence regarding pain following the DLI would have changed the outcome of the case, as Plaintiff alleges.

Further, the ALJ in this case did consider evidence generated following the DLI. *See* Tr. at 27-28. The ALJ found that those records were too far removed from the DLI to be relevant. The undersigned agrees with the ALJ's analysis. Evidence generated following the DLI is relevant only to the extent that it sheds light on a claimant's condition during the insured period. *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) citing *Martonik v. Heckler*, 773 F.2d 236, 240-41 (8th Cir.1985). In this case substantial evidence exists that was generated during the insured period that supports the ALJ's decision. Plaintiff reported activities of daily living that are inconsistent with complaints of disabling pain to Dr. Sipps. Additionally, as the ALJ outlined, several medical records exist from the insured period and none of them mention debilitating pain. Therefore, the ALJ did not err in finding that the evidence generated following the DLI had no probative value with regard to complaints of pain.

### C. The ALJ's pain analysis.

Plaintiff contends that the ALJ failed to consider her complaints of disabling pain in accordance with the Appeals Council order. ECF Dkt. #13 at 15. Plaintiff reasons that the ALJ's decision following remand from the Appeals Council is basically the same as the first decision, particularly when the findings sections are compared side-by-side. *Id.* at 16. Further, Plaintiff argues that the ALJ failed to discuss the criteria for evaluation of pain complaints under 20 C.F.R. § 404.1529 and SSR 96-7p. *Id.*

The undersigned finds Plaintiff's argument to be without merit because the ALJ acknowledged that she was reconsidering the case under 20 C.F.R. § 404.1529 and SSR 96-7p and she did evaluate Plaintiff's complaints of pain in accordance with those regulations.

The social security regulations establish a two-step process for evaluating pain. In order for pain or other subjective complaints to be considered disabling, there must be: (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the alleged disabling pain, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *Duncan v. Sec'y of Health and Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).

When a disability determination cannot be made on the basis of the objective medical evidence, an ALJ must analyze the plaintiff's credibility, considering her statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in 20 C.F.R. § 416.929 and Social Security Ruling 96-7p. Subjective complaints of pain can support a disability claim if objective medical evidence of an underlying condition exists in the record. *Wyatt v. Sec'y of Health and Human Servs.*, 974 F.2d 680, 686 (6th Cir. 1992). Other relevant factors that the ALJ must consider include the claimant's daily activities; the location, duration, frequency, and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; and treatment or measures, other than medication, taken to relieve pain. 20 C.F.R. 416.929(c)(3)(i)-(vi); SSR 96-7p. However, an ALJ is not required to accept a plaintiff's own testimony regarding her pain. *Gooch v. Sec'y of Health and Human Servs.,* 833 F.2d 589, 592 (6th Cir. 1987). Since the ALJ has the opportunity to observe the claimant in person, great deference is given to the ALJ's conclusion about the claimant's credibility. *McCoy o/b/o McCoy v. Comm'r of Soc. Sec.,* 81 F.3d 44, 47 (6th Cir. 1995). Nevertheless, substantial evidence must support an ALJ's assessment of a claimant's credibility. *Id.* If the ALJ rejects or discounts the claimant's complaints as not credible, he must clearly state his reasons for doing so. *Felisky v. Bowen,* 35 F.3d 1027, 1036 (6th Cir. 1994).

In this case, the ALJ initially failed to properly evaluate Plaintiff's complaints of pain and the Appeals Council remanded the case for further consideration by the ALJ. Plaintiff contends that the ALJ failed to comply with the order of remand, reasoning that the "Evaluation of the Evidence" section contains no citation to 20 C.F.R. § 404.1529 and SSR 96-7p. ECF Dkt. #13 at 16. The undersigned is not aware of any requirement that the ALJ specifically acknowledge 20 C.F.R. § 404.1529 and SSR 96-7p. Regardless, in this case the ALJ did comply with the order because she included a discussion in her second opinion about Plaintiff's activities of daily living and concluded that those activities were inconsistent with Plaintiff's complaints of pain. Tr. at 26-27, 28. Furthermore, the ALJ noted all of the medical records where Plaintiff did not report pain or reported "feeling good." The fact that the ALJ's findings were similar is of no weight, because in this case, the ALJ simply articulated her rationale in more detail on remand.

Plaintiff contends that her work record shows that she is not a person who easily complains of pain. ECF Dkt. #13 at 16. This argument, however, is not compelling, because if Plaintiff were experiencing debilitating pain, one would expect her to report that pain to her treating physicians so that she could be treated. Plaintiff did not do so during the insured period. Therefore, the undersigned finds that the ALJ relied upon substantial evidence by discussing Plaintiff's medical records showing no reports of debilitating pain prior to the DLI.

Lastly, Plaintiff's assertions that the ALJ failed to discuss the criteria for an analysis of pain are misplaced. The ALJ stated on the first page of her opinion that she was evaluating the case under the standard set forth in 20 C.F.R. § 404.1529 and SSR 96-7p. Tr. at 23. Furthermore, the ALJ went on to consider evidence of daily activities and the complete lack of documented reports of disabling pain. These are factors set forth in 20 C.F.R. § 416.929(c)(3)(i)-(vi) and SSR 96-7p. The undersigned is not aware of any requirement to specifically articulate the standard for review under 20 C.F.R. § 404.1529 and SSR 96-7p, and Plaintiff has not pointed the Court to any precedent requiring such an articulation. Here, the ALJ clearly stated her reasons for discounting Plaintiff's complaints of pain, and that is all the articulation that is required. *See Felisky,* 35 F.3d at 1036. Therefore, the undersigned finds that the ALJ's decision was supported by substantial evidence.

**D.      Whether the ALJ's decision, as a whole, was supported by substantial evidence.**

Lastly, Plaintiff contends that the ALJ's decision was not supported by substantial evidence because she did not consider the entire record. ECF Dkt. #13 at 17. Plaintiff specifically argues that the ALJ erred in finding that Plaintiff had no exertional limits, which would mean that she can lift 50 pounds frequently and 100 pounds occasionally and stand/walk for up to six hours in an eight-hour workday. *Id*.

As discussed above, however, the ALJ did properly discuss evidence generated following the DLI and acted within her discretion in discounting it. *See supra* §V.B.. Further, the ALJ properly reviewed other objective evidence in the record. *See supra* §V.C.. Therefore, the ALJ's decision is supported by substantial evidence.

Plaintiff's argument regarding the ALJ's finding with respect to exertional limits lacks merit because Plaintiff failed to demonstrate any exertional limits. As discussed above, the ALJ acted within her discretion in discrediting Plaintiff's complaints of pain. Further, the vocational expert testified that Plaintiff's previous work as a nurse's aide required heavy exertion. The ALJ properly found that Plaintiff could not perform her past work because of a restriction to 1-2 step tasks and an inability to deal with the general public, *not* because of a physical restriction. The ALJ further found that Plaintiff could perform the vocational requirements for bench assembly, wire working, and electronics working positions, as set forth by the vocational expert in exhibit 16E. Tr. at 29 citing Tr. at 139. All of these positions are performed at the light exertional level. Tr. at 139. Therefore, the undersigned fails to see how Plaintiff was prejudiced by any error in this regard.

## VI. CONCLUSION

For the foregoing reasons, the undersigned RECOMMENDS that the Court AFFIRM the ALJ's decision and DISMISS the instant case.

DATE: July 21, 2008                */s/George J. Limbert*
                                                                                        GEORGE J. LIMBERT
                                                                                        UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).